Citation Nr: 1719111 
Decision Date: 05/31/17 Archive Date: 06/06/17

DOCKET NO. 13-08 318 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Winston-Salem, North Carolina


THE ISSUE

Entitlement to an initial rating in excess of 30 percent for posttraumatic stress disorder (PTSD).


REPRESENTATION

Veteran represented by: Disabled American Veterans


ATTORNEY FOR THE BOARD

Polly Johnson, Associate Counsel






INTRODUCTION

The Veteran had active service from September 1998 to January 1999 and from February 2003 to January 2004, and served in the United States Army Reserve until September 2006.

This case comes to the Board of Veterans' Appeals (Board) on appeal from an April 2011 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Winston-Salem, North Carolina, which granted service connection for PTSD and assigned an initial 30 percent disability rating, effective May 16, 2008.

In April 2015, the Board remanded the instant claim. A review of the record reflects substantial compliance with the Board's remand directives. See Stegall v. West, 11 Vet. App. 268, 271 (1998). The claim has been returned to the Board for appellate review.


FINDING OF FACT

For the entire period under review, the Veteran's PTSD has been manifested by occupational and social impairment with deficiencies in most areas, but not by total occupational and social impairment.


CONCLUSION OF LAW

Resolving all reasonable doubt in the Veteran's favor, the criteria for a 70 percent initial rating for PTSD have been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.321, 4.1, 4.3, 4.7, 4.126, 4.130, Diagnostic Code 9411 (2016).

 


REASONS AND BASES FOR FINDING AND CONCLUSION

I. VA's Duties to Notify and Assist

The Veterans Claims Assistance Act of 2000 (VCAA) and implementing regulations impose obligations on VA to provide claimants with notice and assistance. 38 U.S.C.A. §§ 5102, 5103, 5103A, 5107; 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). Proper VCAA notice must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; and (3) that the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1). 

Concerning the issue decided herein, VA's General Counsel has held that VCAA notice is not required for "downstream" questions. VAOPGCPREC 8-2003. Additionally, the Court has held that the statutory scheme contemplates that once a decision granting service connection, a disability rating, and an effective date has been made, § 5103(a) notice has served its purpose, and its application is no longer required because the claim has already been substantiated. Dingess v. Nicholson, 19 Vet. App. 473, 490 (2006). Here, the Veteran was granted service connection for PTSD in April 2011, and he was assigned a disability rating and effective date in that decision. As the issue currently before the Board stems from disagreement with a "downstream" question, no additional notice is required with respect to this issue because the purpose that the notice is intended to serve has been fulfilled with respect to the current claim. See Hartman v. Nicholson, 483 F.3d 1311, 1314-15 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112, 116-17 (2007). 

The VCAA also requires VA to make reasonable efforts to help a claimant obtain evidence necessary to substantiate his claim. 38 U.S.C.A. § 5103A; 38 C.F.R. § 3.159 (c), (d). This "duty to assist" contemplates that VA will help a claimant obtain records relevant to his claim, whether or not the records are in Federal custody, and that VA will provide a medical examination and/or opinion when necessary to make a decision on a claim. 38 U.S.C.A. § 5103A (d); 38 C.F.R. § 3.159 (c)(4).

In the present case, the Board finds that the duty to assist has been fulfilled. The Veteran's service treatment records have been obtained. He has also been examined (in March 2011 and June 2015). The reports of those examinations, taken together with other evidence of record, contain descriptions of impairment sufficient for the proper evaluation of his disability. There is no suggestion on the current record that there is any other evidence outstanding. As such, no further development action is required.

II. Analysis

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities, found in 38 C.F.R., Part 4. The rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. § 4.7. All benefit of the doubt will be resolved in the appellant's favor. 38 C.F.R. § 4.3. 

The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995). Where an increase in the level of a service-connected disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). However, where the question for consideration is entitlement to a higher initial rating assigned following the grant of service connection, evaluation of the medical evidence since the effective date of the grant of service connection and consideration of the appropriateness of "staged ratings" (assignment of different ratings for distinct periods of time, based on the facts found) is required. Fenderson v. West, 12 Vet. App. 119, 126 (1999).
In the present case, service connection for PTSD was granted in April 2011, at which time the AOJ assigned an initial 30 percent disability rating pursuant to 38 C.F.R. § 4.130, Diagnostic Code 9411, effective May 16, 2008.

PTSD is evaluated under a general rating formula for mental disorders. See 38 C.F.R. § 4.130, Diagnostic Code 9411. A 30 percent rating is assigned for occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks (although generally functioning satisfactorily, with routine behavior, self-care, and conversation normal), due to such symptoms as: depressed mood, anxiety, suspiciousness, panic attacks (weekly or less often), chronic sleep impairment, and mild memory loss (such as forgetting names, directions, recent events). Id.

A 50 percent rating is warranted where there is occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Id.

A 70 percent rating is warranted for occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a work-like setting); and the inability to establish and maintain effective relationships.

A 100 percent rating is warranted where there is total occupational and social impairment, due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name.

When determining the appropriate disability rating to assign, the Board's primary consideration is the veteran's symptoms, but it must also make findings as to how those symptoms impact the veteran's occupational and social impairment. Vazquez-Claudio v. Shinseki, 713 F.3d 112, 118 (Fed. Cir. 2013); Mauerhan v. Principi, 16 Vet. App. 436, 442 (2002). Because the use of the term "such as" in the rating criteria demonstrates that the symptoms after that phrase are not intended to constitute an exhaustive list, the Board need not find the presence of all, most, or even some, of the enumerated symptoms to award a specific rating. Mauerhan, 16 Vet. App. at 442; see also Sellers v. Principi, 372 F.3d 1318, 1326-27 (Fed. Cir. 2004). Nevertheless, all ratings in the general rating formula are also associated with objectively observable symptomatology and the plain language of the regulation makes it clear that the veteran's impairment must be "due to" those symptoms. A veteran may only qualify for a given disability by demonstrating the particular symptoms associated with that percentage, or others of similar severity, frequency, and duration. Vazquez-Claudio, 713 F.3d at 118.

The pertinent evidence includes VA treatment records dated from June 2005 to July 2015, VA examination reports dated March 2011 and June 2015, and statements from coworkers, fellow servicemen, the Veteran, and the Veteran's spouse.

A June 2005 post-deployment screen was negative for PTSD and depression but positive for alcohol. A second PTSD screen in August 2006 was also negative. 

In August 2008, the Veteran completed standardized psychological testing through his local VA medical center. He recounted his service in the United States Army from 1998 - 2006, including a deployment in Iraq in 2003. His military occupational specialty (MOS) was an administrative specialist. While serving in that capacity, he provided security for six convoys delivering petroleum. He reported that while deployed in Iraq, he was exposed to traumatic experiences that were associated with significant feelings of fear, helplessness, and horror. He described a particularly traumatic experience in Iraq, during which a car exploded in close proximity to a vehicle in which he was travelling, an incident that "put him over the edge."

During this interview, the Veteran reported intrusive, unwanted memories of the events in Iraq one to two times over the past month that led to some disruption of activities. He experienced moderate psychological distress when exposed to reminders of his experiences, such as sudden noises. Upon having such experiences, it would typically take him five to ten minutes to calm down. He avoided conversations, thoughts, and feelings about his combat experiences as well as war-related news coverage. He stated that he drank one to two beers per day on Sunday through Monday, and six to twelve beers and one to two shots on Fridays and Saturdays. He said that he avoided activities, places, and people that reminded him of the traumatic events he experienced in service. 

He reported hypervigilant behavior such as locking all car doors when stopped at a stoplight, keeping a bayonet by his bed, and completing perimeter checks of his home while armed with the bayonet. 

He endorsed hyperarousal symptoms to include sleep difficulties, characterized by mid-sleep awakening and easily being awoken by nighttime noises. After such experiences, he could return to sleep after 20 minutes. He acknowledged experiencing severe irritability and anger several times a week, and having to suppress "angry outbursts" at work. 

He also reported detachment from people, little to no contact with family members, an inability to experience happiness or sympathy, and a sense of a foreshortened future. He said that he and his wife argued frequently and he called her "bad names" and would grab her or throw her on the bed.

He reported having been fired from a previous job due to lateness, which he blamed on his sleeping problems. Though employed at the time of the PTSD assessment, the Veteran reported that intrusive thoughts, psychological distress, and physical reactivity often disrupted his work days.

He stated that he engaged in heavy alcohol consumption, spending much of his time drinking, feeling the effects of drinking, or recovering from drinking. He experienced alcohol-induced memory loss one time per month. He stated that the above symptoms began shortly after he returned from Iraq. He denied any homicidal ideation during the interview.

In a September 2008 statement, the Veteran's spouse stated that the Veteran, prior to deployment, was an "open-spirited, outspoken person" who loved to be the center of attention. He loved to be around his family and friends. Post-deployment, however, he avoided large crowds, so as not to become "anxious and jumpy." Upon his return from Iraq, he seemed "normal at first," but soon thereafter, he would become "irritated and upset" at the sound of their children jumping and playing upstairs, to the point of "yelling and cussing at the kids, telling them to shut up and sit down." She stated that he "turned to drugs and alcohol [...] smoked marijuana almost every day, sometimes several times a day." When he was under the influence of marijuana, she wrote, he was calm and would spend time with his family. However, once during an argument, the Veteran came up behind her and choked her with a towel, saying that he would take her out. She also noticed a change in his sleeping habits. Specifically, he kept a knife close by and appeared to be "listening for something." She expressed that it was hard for her and the couple's children to adapt to the changes in his behavior.

In September 2008, a VA clinical psychologist advised that the Veteran continue to receive psychological services through VA, as he was impacted by his PTSD on a daily basis. He reported that the Veteran's PTSD negatively impacted his relationships with his wife and children, and he expressed concern that his PTSD could impact the Veteran's employment. He stated that the Veteran is uncomfortable around crowds and is constantly on guard.

A March 2009 VA treatment record reflects the Veteran's continued difficulty with irritability, hypervigilance, avoidance, and nightmares, with increased physiologic arousal. He reported sleeping seven hours per night, drinking every day of the week, using marijuana two to three times per week, spending little time with friends and family, and shouting and becoming physical with his wife. He reported having a depressed mood for part of each day, every other day, but denied anhedonia, panic attacks, auditory hallucinations, or difficulty with concentration, memory, focus, attention, or thinking. He reported rare thoughts of passive suicidal ideation but no active ideation. The treatment note reflects that the Veteran's speech was normal, his affect was mildly depressed and moderately irritable, his judgment was good, and his insight was fair to good.

In April 2009 he reported continued, though decreased, irritability, hypervigilance, and avoidance. He denied suicidal or homicidal ideation.

In August 2009, he reported continued conflict at home and increased stress at work. He stated that he continued to consume alcohol heavily on the weekends, but not during the work week. He requested a different medication, as he had negative physical side effects from a different medication that had been prescribed.

He showed improvement with his symptoms as reflected in an October 2009 VA treatment note, in which he reported feeling less irritable, calmer, and more able to tolerate his noisy children. He reported continuing nervousness and anxiety, and intrusive memories of the explosion he experienced. He reported decreased alcohol consumption. 
 
In a November 2009 statement, the Veteran expressed his struggle with losing "family, friends, enjoyments of life, and employment" due to his PTSD. He stated that his feelings of anger, depression, and fear only worsened upon returning from active service, and he started to "self-medicate through drugs and alcohol." He expressed getting "physical with [his] wife, something [he] never did prior to [his] deployment." He said it was hard to be around his kids "because of the irritability that comes with their noise."

In May 2010, the Veteran reported severe irritability with family and coworkers with frequent verbal altercations, crying spells in frustration about the potential impact of his behavior on his children, depressed mood on some days, thoughts of foreshortened future, and passive suicidal ideation without intent or plan. He denied anhedonia.

In August 2010, he reported infrequent suicidal ideation, but also stated that he "would never do that," due to his "strong Christian faith." He reported improvement with his hypervigilance.

In September 2010, he had positive screens for alcohol and depression. He reported feeling hopeless about the present and future, and recounted thoughts about taking his own life.

An October 2010 treatment note reflects continued irritability and hypervigilance and infrequent passive suicidal ideation without intent or plan.

In March 2011, the Veteran underwent a VA examination to assess the nature and severity of his PTSD. During the examination, the Veteran said that he felt "irritated, helpless [and] down." Upon examination, his attitude was cooperative, his affect was appropriate, his speech was unremarkable, he was oriented as to person, time, and place, and he was able to spell a word forward and backward. No hallucinations or inappropriate behavior were indicated. Obsessive behavior in the form of washing hands 15-20 times per day and washing his soda bottles before drinking from them was noted. The Veteran did not report having panic attacks, and denied homicidal or suicidal thoughts, though did report having had suicidal thoughts in the past. Reported episodes of violence included pushing and shoving his wife during arguments. His remote and immediate memory was normal, and recent memory was mildly impaired. He reported daily intrusive thoughts of events from Iraq, and stated he feared cars on the side of the road, overpasses, and debris in the road. He did not complain of sleep impairment. He was assigned a GAF score of 60.

He described his discomfort around large groups, and decreased contact with his family than before his deployment to Iraq. He stated the ability to feel love, but noted difficulty feeling happiness. He expressed a mild sense of foreshortened future. He also reported difficulty falling asleep, and easily awakening to household sounds, like creaks, wind, or children walking through the house.

He reported being employed full time as an accountant but experienced decreased concentration and poor social interaction. He preferred to work from home so as to work alone. The examiner noted that the Veteran was generally capable of routine self-care, interactions with others in a smaller, more intimate setting, managing finances, and working. However, the examiner noted that the Veteran made certain accommodations such as working at home, to cope with his discomfort around large groups of people.

The Veteran presented at an August 2011 VA psychiatry appointment with his chief concern being: "No one understands me - it is me against the world." He reported continued severe hypervigilance, to include repeatedly checking door locks and his rearview mirror at stoplights. Notably, he stated that he changed his position at his work to have his back to the wall. He reported some dreams about military life. He denied suicidal and homicidal ideation.

At an October 2011 VA mental health appointment, the Veteran reported having thoughts about taking his own life, but said he had no plan and had never made a suicide attempt. An alcohol screen was negative, and a depression screen was positive.

In November 2011, he presented at a VA appointment as depressed, minimally irritable, and not dysphoric. He denied auditory and visual hallucinations, as well as suicidal or homicidal ideation. His insight and judgment were good. He reported having intrusive memories in the daytime and infrequent nightmares. Recollections of the underpass in Iraq near which a car exploded caused him the most distress. He reported occasional thoughts of "giving up," meaning, "not going to work, just stopping my responsibilities," but noted that thoughts of his children and family motivated him to continue. 
In July 2012, a VA psychiatrist encouraged the Veteran to enroll in group therapy through VA. At that appointment, the Veteran was neatly, casually dressed, with no abnormal movements. His speech was normal as to rate, tone, and volume. His affect was mildly depressed, minimally irritable, and not dysphoric. He denied auditory and visual hallucinations. He reported ongoing alcohol and cannabis use. He reported occasional passive suicidal ideation, asking, "Would my family be better without me?" He said he had no plan or intent, and that he did not have a firearm in his home. He reported being described by colleagues as "defensive." 

At a November 2012 VA primary care visit, the Veteran had positive screens for depression and alcohol. He reported feeling hopeless about the future and conveyed thoughts about taking his own life, though he denied having a plan or ever having made an attempt to do so.

In December 2013, a VA neuropsychologist requested that the Veteran be scheduled for a neuropsychological evaluation. He did not follow up with such testing.

In August 2014, he underwent a screening for VA's Substance Use Disorder (SUD) clinic. He acknowledged using alcohol to decrease his job-related anxiety, strife with his spouse, and annoyance with his children. He answered questions related to depression, and his answers suggested mild depression. He noted he last had a suicidal ideation two weeks earlier.

The Veteran met with a VA psychologist in October 2014. He noted his chief concern to be: "I wasn't like this before I went. I used to be a sociable person. Now I keep to myself. Loneliness. I do my best to cope with all of this." He reported his continuing full time employment as an accountant, working 60+ hours weekly. He demonstrated good eye contact, linear speech, and mildly constricted affect. He also reported hypervigilant scanning, avoidance of situations, irregular sleeping, marked irritability, and difficulty trusting people. He said he planned to stay home while his wife took his kids trick or treating for Halloween, and said he felt lonely. He reported limited contact with his own siblings.

He met with the same psychologist in January 2015, and presented as agitated throughout the session, with inconsistent eye contact and obvious distractibility. It was noted that the Veteran's substance use had likely increased since October 2014. 

In March 2015, the Veteran met with a VA psychiatrist, with his chief concern being: "I'm taking one day at a time." His speech was normal as to rate, tone, and volume. He was not irritable or dysphoric. He denied auditory or visual hallucinations as well as suicidal or homicidal ideation. His insight and judgment were good. The psychiatrist again encouraged the Veteran to engage with SUD treatment. 

The Veteran underwent a VA examination in June 2015, during which he reported good relationships with his wife and children, despite his irritability and withdrawal that caused some level of marital strain. He reported excellent relationships with his 12-year old son and 9-year old daughter, and a somewhat difficult relationship with his 17-year old son. He said he attended his children's after school activities. He indicated that he was close to both his mother and his father, typically speaking to each of them one time per week and visiting them when feasible. He denied any significant family strain or problems, though noted that he was not very close with his own siblings. He said he had about "four friends," though he did not disclose much personal information to them. His daily routine, as reported, included waking up at 4am, going back to sleep until 7:00 or 8:00am, working from 9:00am - 5:00pm, attending his children's' school activities, and then spending time in his garage until 9:30pm/10:00pm. 

He stated that he enjoyed playing the drums in his band at his church, and had served as a drummer in the band for the past two years. He reported working as an accountant and having held the job for the past four and a half years. He said he did not socialize with anyone at work. He denied being written up for any disciplinary issues. The examiner noted that the Veteran had an occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, although he was generally able to function satisfactorily, with normal routine behavior, self-care, and conversation.

As to behavior, the examiner noted that the Veteran was "open and cooperative," "reported a depressed mood," and had a "euthymic" affect. He appeared physically with good hygiene and casual dress. His speech was within normal limits in articulation, rate, tone, volume, and production; and he was alert, attentive, and oriented to person, place, time, and situation. The examiner opined that the Veteran was able to manage his financial affairs.

PTSD symptoms diagnosed by the examiner included: recurrent, involuntary, and intrusive distressing memories of the traumatic events the Veteran experienced during service; avoidance of or efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that aroused distressing memories; thoughts, or feelings about or closely associated with the traumatic events in service; negative alterations in cognitions and mood; persistent negative emotional state; feelings of detachment or estrangement from others; persistent inability to experience positive emotions; marked alterations in arousal and reactivity associated with the traumatic events experienced in service, as manifested by irritable behavior and angry outbursts, hypervigilance, exaggerated startled responses, and sleep disturbance; all of which cause impairment in social, occupational, or other important areas of functioning. 

A statement submitted from a fellow serviceman in September 2015 notes that the Veteran became withdrawn during service, and exhibited a combative personality at times. The Veteran "seemed angry most days" while in Iraq. 

A September 2015 statement from a coworker noted that the Veteran "always seems sad, stressed, on alert, and withdrawn." He stated that during interactions, the Veteran seemed "irritated and annoyed." The Veteran always declined the coworker's invitation to "hang out" with other coworkers after work. The coworker noted a decline in the Veteran's work productivity, manifested by missed deadlines, tardiness, and incomplete projects.

His wife submitted a statement in September 2015. In it, she described the change in her husband's behavior upon his return from Iraq. Specifically, she noticed that "he started to alienate himself from his family and friends... when they would visit he would tell me not to answer the door." She described his temperament as "hypervigilant," "controlling," "miserable," and "irate." She discussed his irritation at even mild noise, such as their playing children, his chronic sleep issues, and his anger.

Finally, the Veteran, through a September 2016 statement submitted by his representative, recounted his ongoing struggle with PTSD and its effects on not just himself, but his family, noting that he has no social life due to his anxiety and depression. The Veteran said that his family has suffered because of his desire to "sit at home and not talk with others." His anxiety prevents him from "being able to go out in public to dinner" or "go up in front of people." 

After a careful review of all lay and medical evidence of record pertinent to the applicable time period at issue, and after resolving all reasonable doubt in favor of the Veteran, the Board finds that the most persuasive evidence regarding the overall severity of his social and occupational impairment due to his service-connected PTSD supports the award of a 70 percent rating. While there have been day-to-day fluctuations in the manifestations of the Veteran's service-connected PTSD, the evidence shows no distinct periods of time during the appeal period when the Veteran's disorder varied to such an extent that a rating greater or less than 70 percent would be warranted. See Fenderson, 12 Vet. App. at 126.

Overall, the Board finds that throughout the appeal period, the Veteran's PTSD was manifested by: depressed mood and anxiety; suicidal ideation; chronic sleep impairment; recurrent and intrusive distressing recollections related to his military experiences; hypervigilance; angry outbursts and irritability, including periods of unprovoked violence; avoidance behaviors, including avoiding the news and withdrawal from work and family; and mild impairment in memory. Collectively, these symptoms are of the type, extent, severity, and/or frequency that more nearly approximate occupational and social impairment with deficiencies in most areas of the Veteran's life, including work, family relations, judgment, thinking, and mood.

However, the Board finds that the preponderance of the evidence is against a finding that his PTSD resulted in total occupational and social impairment to warrant a 100 percent disability rating. In this regard, there is no evidence in the record showing that his PTSD was manifested by such symptoms such as gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; intermittent inability to perform activities of daily living; disorientation to time or place; or memory loss for names of close relatives, own occupation, or own name.

Indeed, his VA treatment records indicate that the Veteran has consistently been noted to be oriented to person, time, and place. There is nothing in the record which suggests that he has ever suffered from hallucinations or delusions. There is also nothing in the record suggesting that he has been unable to perform activities of daily living, that he requires personal monitoring for safety, or that he is incapable of maintaining personal hygiene. To the contrary, his VA treatment records and VA examination reports note that the Veteran's functioning can be described as satisfactory as he has routine behaviors, is capable of not only self-care, but also the care of his family, is able to handle his financial affairs, and is able to engage in generally normal conversation.

In addition, total social and/or occupational impairment has not been demonstrated as he has been able to maintain a longstanding marriage to his wife, relationships with his children, and a full time job. Furthermore, the record indicates that the Veteran has been a regular and active member of his church's band. 

Instead, the Board finds that the Veteran's PTSD has been manifested by symptoms that are of the type, extent, frequency, and/or severity that is indicative of occupational and social impairment, with deficiencies in most areas, such as work, family relations, judgment, thinking, and mood.

In this regard, throughout the appeal period, the Veteran has endorsed thoughts of suicidal ideation on multiple occasions, to include in March 2009, May 2010, August 2010, October 2010, October 2011 and August 2014. See Bankhead v. Shulkin, 2017 U.S. App. Vet. Claims LEXIS 435 (March 27, 2017) (the language of the regulation indicates that the presence of suicidal ideation alone, that is, a veteran's thoughts of his or her own death or thoughts of engaging in suicide-related behavior, may cause occupational and social impairment with deficiencies in most areas). 

Moreover, the record contains evidence that the Veteran has suffered in maintaining effective work and social relationships and has tended to isolate himself in both personal and professional settings. Contrary to the findings of the June 2015 VA examiner (who indicated only an occasional decrease in work efficiency),the above-referenced September 2015 statement from a coworker indicated that the Veteran became irritated and annoyed when communicating with coworkers, that the Veteran has been sent home on numerous occasions due to his anger and confrontation with other colleagues, and that his work has suffered as a result, to include missed deadlines, tardiness, truancy, and incomplete projects. In various statements, the Veteran indicated that he preferred to work from home, and if not possible, to work with headphones so as to isolate himself from his coworkers. 

Discord with his spouse and family is also evident from the record. The Veteran and his wife engaged in verbal, and sometimes physical, altercations (see, August 2008 Spouse Statement in Support of Claim, November 2009 Veteran's Statement). His wife's statements recount a loving, family man whose demeanor shifted upon his return from Iraq. Notes from VA treatment records indicate that the Veteran secluded himself from his family, sometimes wondering if they would be better off without him. During his June 2015 VA examination, though he denied significant family strain and reported good relationships with his two younger children and his own parents, he also noted that he tended to "withdraw" from family and friends. 

The Board notes that, in analyzing this claim, the symptoms identified in the General Rating Formula for Mental Disorders have been considered not as an exhaustive list of symptoms, but as examples of the type and degree of the symptoms, or effects, that would justify a particular rating. The Board has not required the presence of a specified quantity of symptoms to warrant a higher rating for PTSD. See Mauerhan, supra. While the Veteran has not demonstrated each and every symptom associated with the 70 percent rating criteria since the beginning of the appeal period, the Board emphasizes that not all of the symptoms must be shown to warrant a higher rating.
In assessing the severity of his PTSD, the Board has considered the competent lay assertions regarding the symptoms the Veteran has experienced and observed. See, e.g., Layno v. Brown, 6 Vet. App. 465, 470 (1994). However, the criteria needed to support a higher rating require medical findings that are within the province of trained medical professionals. See Jones v. Brown, 7 Vet. App. 134, 137-38 (1994). As such, the lay assertions are not considered more persuasive than the objective medical findings which, as indicated above, do not support the assignment of a higher rating at any point during this appeal than 70 percent.

The Board has further considered whether additional staged ratings under Hart, supra, are appropriate for the Veteran's PTSD; however, the Board finds that his symptomatology has been stable throughout the appeal period. Therefore, assigning any staged rating for this disability is not warranted.

Neither the Veteran nor his representative has raised any other issues, nor have any other issues been reasonably raised by the record. See Doucette v. Shulkin, No. 15-2818, 2017 U.S. App. Vet. Claims LEXIS 319, *8-9 (Vet. App. March 17, 2017) (confirming that the Board is not required to address issues unless they are specifically raised by the claimant or reasonably raised by the evidence of record).

Finally, the United States Court of Appeals for Veterans Claims (Court) has held that entitlement to a TDIU may be an element of an appeal for a higher initial rating. Rice v. Shinseki, 22 Vet. App. 447 (2009). Entitlement to a TDIU is raised where a veteran: (1) submits evidence of a medical disability; (2) makes a claim for the highest rating possible; and (3) submits evidence of unemployability. Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001); see Jackson v. Shinseki, 587 F.3d 1106, 1109-10 (2009) (holding that an inferred claim for a TDIU is raised as part of an increased rating claim only when the Roberson requirements are met). The Veteran has not reported, and the evidence does not otherwise reflect, that he has been unemployed during the claim period due solely to service-connected disability or that he has been prevented from securing and following gainful employment due to any such disability. As there is no evidence of unemployability due to service-connected disability, the question of entitlement to a TDIU is not raised under Roberson and Rice in this instance.
In sum, after resolving all reasonable doubt in the Veteran's favor, the Board finds that the Veteran's PTSD symptoms more nearly approximate the criteria under Diagnostic Code 9411 for a rating of 70 percent, but no higher, for the entire period on appeal. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3, 4.7, 4.130. 


ORDER

A 70 percent initial rating for PTSD is granted, subject to the controlling regulations governing monetary awards.



____________________________________________
V. Chiappetta
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs